# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

CRST EXPEDITED, INC,

        Plaintiff,

vs.

SWIFT TRANSPORTATION CO OF
ARIZONA, LLC,

        Defendant.

No. 17-cv-25-CJW-KEM

**MEMORANDUM OPINION
AND ORDER**

---

## TABLE OF CONTENTS

I.     FACTUAL BACKGROUND ................................................................. 2

II.    APPLICABLE LAW ........................................................................ 5

III.   NATURE OF CLAIMS AND CONTRACTS........................................ 8

IV.   CRST v. TransAm ......................................................................12

V.    DISCUSSION OF CLAIMS............................................................14

        A.    Intentional Interference with Contract ..........................................14

               1.    Contract Validity and Enforceability ..................................14

                       a.    Lack of Protectable Interest.....................................18

                       b.    Violation of Public Policy........................................26

               2.    Knowledge ..............................................................31

               3.    Intentional and Improper Conduct ....................................33

       4.      Causation..................................................................36

       5.      Damages...................................................................39

   B.     Intentional Interference with Prospective Economic Advantage ...........41

   C.     Unjust Enrichment ...............................................................45

   D.     Injunctive Relief.................................................................50

VI.   AFFIRMATIVE DEFENSES .......................................................53

   A.     Voidability Defenses.............................................................54

   B.     Remaining Defenses ............................................................56

VII.  CONCLUSION ....................................................................58

This matter is before the Court on the parties' cross motions for summary judgment. (Docs. 127, 138). CRST Expedited ("plaintiff") moves for partial summary judgment, and Swift Transportation ("defendant") moves for complete summary judgment. Each party timely resisted the other party's motion (Docs. 146, 159), and each party timely filed a reply in support of its own motion (Docs. 154, 167). The Court heard oral argument on the motions on April 11, 2019. (*See* Doc. 168). For the following reasons, plaintiff's motion (Doc. 127) is **granted in part and denied in part**, and defendant's motion (Doc. 138) is **granted in part and denied in part**.

## *I.*   *FACTUAL BACKGROUND*

Plaintiff and defendant are both commercial trucking companies that provide freight-hauling services throughout the country. To operate a semi-trailer, an individual must possess a commercial driver's license ("CDL"). (Docs. 130-1, at 2; 146-1, at 2). The trucking industry, however, is facing a shortage of licensed drivers. (Docs. 130-1,

at 1-2; 146-1, at 2).  Plaintiff operates a driver training program that allows individuals to obtain their CDLs.  (Docs. 130-1, at 2; 146-1, at 2).  When individuals enroll in the training program, plaintiff advances the costs of transportation to the training site, lodging, drug tests, physicals, and tuition for the program.  (*See* Docs. 130-1, at 2; 146-1, at 2).  These advances are ultimately to be repaid to plaintiff either through a reduced rate of pay until the debt has been satisfied, or through a lump sum payment to plaintiff, as is explained below.  (Docs. 140-1, at 8-9; 159-1, at 18, 20).

Before training commences, each trainee signs a Pre-Employment Agreement. (Docs. 43, at 2-3; 146-1, at 5; *see, e.g.*, Doc. 159-9, at 242-46).  The training program consists of four phases (Docs. 140-1, at 6; 159-1, at 10), and upon completion of the first two phases, those students who are hired by plaintiff sign a Driver Employment Contract ("Driver Contract") (Docs. 140-1, at 12; 159-1, at 26).  The Driver Contracts contain either an eight-month or a ten-month restrictive term, during which time the driver-signatory is prohibited from driving for one of plaintiff's "competitors."[1]  (Docs. 130-2, at 51-52; 140-1, at 12; 159-1, at 28).  If a driver is discharged or leaves employment before the restrictive term ends, the driver cannot work for any "CRST competitor" during the remainder of the restrictive term.[2]  (Docs. 130-2, at 51-52; 140-1, at 16; 159-

---

[1] In their pleadings, the parties refer to the restrictive term as being for ten months, even though certain contracts specify an eight-month restrictive term.  For the sake of simplicity, the Court will refer to the restrictive term as being for ten months for all drivers at issue.  Additionally, the parties have produced hundreds of Driver Contracts to the Court, all of which appear to contain the same material terms, with the exception of the duration of the restrictive term.  The parties have not identified any material differences in any of the contracts, and the Court will cite to only one contract as representative of the entire body of contracts.

[2] It is unclear whether plaintiff considers a driver to be within the restrictive term of his contract until he has worked for plaintiff for ten months, or whether plaintiff considers the restrictive term to have lapsed ten months after the driver signed the contract.  Defendant asserts that plaintiff operates under the former interpretation.  (Doc. 140-1, at 16-17).  Although plaintiff "[d]enie[s]" these assertions (Doc. 159-1, at 40-41), plaintiff does not clearly explain its

1, at 38-39). In addition, a driver who leaves employment before his restrictive term ends is charged $6,500, regardless of the amount of time remaining on his restrictive term.[3] (Docs. 140-1, at 16; 159-1, at 38-39; *see also, e.g.*, Doc. 130-2, at 52 (a representative Driver Contract that contains a $6,500 liquidated damages provision)). Plaintiff asserts that if a driver repays the $6,500, he is released from the contract. (Doc. 159-1, at 39).

Plaintiff brought suit alleging that defendant has actively recruited and continues to actively recruit plaintiff's drivers, even though those drivers remain within the restrictive terms of their Driver Contracts. (Doc. 43, at 4). Specifically, plaintiff asserts that defendant is aware that the drivers at issue[4] remain within the restrictive terms of their contracts, and that defendant's conduct of actively recruiting its drivers is the cause of the drivers leaving plaintiff to drive for defendant. (*Id.*, at 5-10). By hiring drivers who obtained their CDL at plaintiff's expense, plaintiff asserts that defendant is able to gain the advantage of hiring licensed commercial truck drivers without undertaking the

---

interpretation of when the restrictive terms lapse. (*See* Doc. 130, at 11 ("Ten months after [plaintiff's] drivers fulfill the period for which they agreed to drive for [plaintiff], these previously unqualified drivers are available to [defendant] and other competitors . . ..")). Further, plaintiff asserts that when the restrictive terms expire is immaterial to the current issues because, plaintiff urges, "all of the drivers at issue herein were hired by [defendant] within the restrictive term of their respective contract obligations." (Doc. 159-1, at 41).

[3] The Court notes that the Pre-Employment Agreements provide that each trainee will repay plaintiff for the costs of training and also contain non-competition provisions. (*See, e.g.*, Doc. 159-9, at 243-44). The parties do not, however, argue their motions for summary judgment with respect to these provisions in the Pre-Employment Agreements. The Court's focus will, thus, remain on the Driver Contracts.

[4] Plaintiff has identified 250 drivers as being at issue in this case. (Docs. 140-1, at 33; 159-1, at 79). Plaintiff has provided a spreadsheet that identifies each of the drivers at issue. (Doc. 130-7, at 75-79). Although there are 251 individuals listed on the spreadsheet, one name appears twice. (*See id.*, at 75). Based on the parties' representations that only 250 drivers are at issue here, the Court assumes that the name that appears twice belongs to the same individual.

expense of training those drivers. (*Id.*, at 6-7). Based on these allegations, plaintiff brought claims for intentional interference with contract, intentional interference with prospective economic advantage, and unjust enrichment. (*Id.*, at 5-8). Plaintiff also seeks permanent injunctive relief "enjoining [defendant] from any further or continued interference with [plaintiff's] prospective economic advantage and/or contracts with its drivers . . .." (*Id.*, at 8-10).

An essential element of plaintiff's tortious interference with contract claim is that the contracts with the drivers were valid. *See Gen. Elec. Capital Corp. v. Commercial Servs. Grp., Inc.*, 485 F. Supp. 2d 1015, 1025 (N.D. Iowa 2007) (citations omitted). Plaintiff's motion for summary judgment requests only that the Court find that the contracts were valid and that the Court "eliminate all affirmative defenses addressing that element." (Doc. 130, at 3). Defendant's motion seeks complete summary judgment as to each of plaintiff's claims. (Doc. 138).

## II. APPLICABLE LAW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law . . .." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587-88 (citation omitted); *see also Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable

to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them" (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). "Rather, the court's function is to determine whether a dispute about a material fact is genuine . . .." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

The mere existence of cross motions for summary judgment does not mean the parties are taking inconsistent positions. *See Jacobson v. Md. Cas. Co.*, 336 F.2d 72, 75 (8th Cir. 1964). There may be genuine issues of material facts regarding one motion but not the other. *Id.* (citation omitted). When a court confronts cross motions for summary judgment, the court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion. *Weber v. Travelers Home & Marine Ins. Co.*, 801 F. Supp. 2d 819, 825 (D. Minn. 2011). On cross motions for summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purpose of the party's own motion. *C. Line, Inc. v. City of Davenport*, 957 F. Supp. 2d 1012, 1024 (S.D. Iowa 2013). A court must consider each motion separately. *Wright v. Keokuk Cty. Health Ctr.*, 399 F. Supp. 2d 938, 946 (S.D. Iowa 2005) (citations omitted). Indeed, the presentation of cross motions for summary judgment does not mandate that a court grant summary judgment in favor of one side or the other. *Hot Stuff Foods, LLC v. Houston Cas. Co.*, 771 F.3d 1071, 1076 (8th Cir. 2014). Similarly, the filing of cross motions for summary judgment does not mean that the parties have waived their right to trial. *See Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or

have the effect of submitting the cause to a plenary determination on the merits." (citations omitted)).

### III. NATURE OF CLAIMS AND CONTRACTS

The parties agree that the Court should apply Iowa law to the merits of plaintiff's claims. (Docs. 140, at 14, 37-38, 39; 159, at 13, 41, 44). The parties disagree, however, as to whether Iowa law governs the validity of the contracts themselves. Plaintiff argues that Iowa law should apply to determine the validity of the contracts. (Doc. 130, at 6 n.2). Defendant does not argue in favor of any specific body of law, but defendant does indicate that other states' laws may be applicable in determining the validity of the contracts. (Doc. 146, at 6 n.1; *see also* Doc. 92, at 57 (hearing transcript in which counsel for defendant agreed to the application of the Iowa standard for tortious interference but advocated for the application for different states' laws in determining the validity of the contracts at issue)). Defendant does not substantiate this argument or otherwise request that the Court engage in a conflict of laws analysis. Thus, the Court will not engage in a conflict of laws analysis and will, instead, apply Iowa law as to all issues. *See Wolgin v. Simon*, 722 F.2d 389, 391 (8th Cir. 1984) ("A federal court exercising jurisdiction solely on the basis of diversity of citizenship must apply the substantive law of the forum in which it sits." (citation omitted)).

Of plaintiff's four claims, two have the potential to be duplicative, either in whole or in part. Plaintiff's claims for tortious interference with contract and for tortious interference with prospective economic advantage are each based on a similar premise, and the claims have similar elements. The differences between the claims lie in the type of interference that is considered "improper," and whether the harm alleged is based on an existing contractual relationship as opposed to a relationship that *may* vest in the future. *Nesler v. Fisher & Co.*, 452 N.W.2d 191, 196-99 (Iowa 1990); *RTL Distrib., Inc. v. Double S Batteries, Inc.*, 545 N.W.2d 587, 590-91 (Iowa Ct. App. 1996). The type of

interference that is considered "improper" is discussed below.

Plaintiff argues that defendant's interference is twofold. First, plaintiff argues that by hiring plaintiff's drivers, defendant has prevented—and continues to prevent—plaintiff's drivers from working for plaintiff. (Doc. 43, at 5-6 (alleging that defendant's actions deprive plaintiff of "a reliable source of professional truck drivers")). Second, plaintiff argues that by hiring plaintiff's drivers, defendant has caused—and continues to cause—plaintiff's drivers to breach their non-competition agreements. (*Id.*, at 7-8 ("[Defendant] has intentionally and improperly interfered with [plaintiff's] Employment Contracts by recruiting, encouraging, and/or otherwise assisting drivers to leave [plaintiff] during the [r]estrictive [t]erm . . ..")).

Under Iowa law, "contracts [that are] terminable at will are more properly protected as a prospective business advantage rather than as a contract." *Compiano v. Hawkeye Bank & Tr.*, 588 N.W.2d 462, 464 (Iowa 1999) (citation omitted). *See also Mills v. Iowa*, 924 F. Supp. 2d 1016, 1041 (S.D. Iowa 2013). Before addressing the merits of each claim, then, the Court must determine whether the drivers were employed on an at-will basis and whether the restrictive covenants were terminable at will. If the Court finds that either, or both, sets of contractual provisions were terminable at will, the Court will characterize the claim relating to that provision as a claim for tortious interference with a *prospective* economic advantage.

To be bound by an ongoing obligation requires a binding contract. Under Iowa law, "[i]t is fundamental that a valid contract must consist of an offer, acceptance, and consideration." *Margeson v. Artis*, 776 N.W.2d 652, 655 (Iowa 2009) (citation omitted). The Court finds that each Driver Contract at issue is supported by an offer, acceptance, and consideration. The parties do not dispute that each driver indicated acceptance, so the Court will assume that each driver accepted the contract offered to him. Likewise, the Court finds that the Driver Contracts were supported by an offer and consideration.

The parties do not dispute that an offer was made to each driver, and the Court agrees. The exact terms of those offers, however, requires some discussion. The Court finds that, in addition to the restrictive covenant discussed at length below, there are two paragraphs of the Driver Employment Contracts that are relevant for present purposes. Those paragraphs read as follows:

> 3. *TERM OF EMPLOYMENT*. The term of [plaintiff's] employment of Employee under this Contract shall be for a period of ten (10) months commencing as of the [date of signing the Contract] (the "Term") subject to termination prior to the end of the Term pursuant to Section 4 of this Contract. Following the Term, [plaintiff] shall employ Employee on an at-will basis, and either party may terminate the employment relationship at any time effective immediately[.]

> 4. *TERMINATION OF EMPLOYMENT*. During the Term[,] Employee's employment may be terminated only for the following reasons: 1) by [plaintiff] with or without Due Cause effective immediately, 2) by mutual agreement of [plaintiff] and Employee, or 3) upon the death of Employee. For purposes of this Contract, "Due Cause" means Employee's breach of this Contract and/or Employee's failure to satisfy or comply with any of the standards, requirements, obligations and conditions set forth in the [CRST Professional Driver's Handbook]. . . .

(Doc. 130-2, at 51).

Paragraph Three of the Driver Contracts would suggest that the drivers are not hired as at-will employees, but, rather, are hired for a defined term of employment. Paragraph Four, however, shows otherwise. Paragraph Four provides that plaintiff can terminate an employee's employment for cause, or for no reason at all, which amounts to plaintiff's reservation of the right to terminate an employee at any time. Thus, even though Paragraph Three purports to set forth a ten-month employment term, Paragraph Four modifies the purported employment term and is best characterized as an offer to employ an employee for an indefinite period of time. The offer that was made to each driver-signatory, then, was not an offer of employment for a period of ten months.

Neither party contends that any driver made a counter offer, so the Court will assume that no counter offers were made. Plaintiff offered to employ each driver for an indefinite period of time, and it is this offer that each driver at issue is alleged to have accepted. Employees who are hired for an indefinite period of time are considered at-will employees. *Allen v. Highway Equip. Co.*, 239 N.W.2d 135, 142 (Iowa 1976). *See also Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 281 (Iowa 2000) ("[T]he traditional doctrine of [at-will employment] is now more properly stated as permitting termination at any time for any lawful reason." (citation, internal quotation marks, and emphasis omitted)). The Court concludes that the drivers at issue here were at-will employees.

The restrictive covenants were, however, for a defined period of time. The contracts specify that the restrictive covenants were for a period of ten months, and the restrictive covenants were not terminable at will by either party. (*See* Doc. 130-2, at 51-52). Although the offer of employment that was made was at-will, the offer to accept employment on condition of the restrictive covenant amounted to an offer to accept employment subject to an ongoing obligation. The contracts were, consequently, for employment at-will, subject to an ongoing obligation not to compete.

Defendant argues that the Driver Contracts were supported by the same consideration as were the Pre-Employment Agreements and were, therefore, invalid for lack of independent consideration. (Doc. 146, at 11-12). The Court disagrees. The consideration for the Pre-Employment Agreements was plaintiff providing training for the drivers. The consideration for the Driver Contracts was plaintiff hiring the drivers. Thus, each contract was supported by independent consideration.

Defendant suggests that plaintiff purports to rely on *continued* employment as consideration for the Driver Contracts. (*Id.*, at 12, n.5). The Court does not view plaintiff as arguing this theory, but the Court would reject the proposal if plaintiff were

offering it. The contracts were for at-will employment and could not constitute an agreement for continued employment. Thus, any promise made by plaintiff to continually employ the drivers would have been illusory and could not constitute consideration. *See Raccoon Valley State Bank v. Gratias*, No. 04-1854, 2006 WL 3798902, at *3 (Iowa Ct. App. Dec. 28, 2006) ("A promise is illusory when it fails to bind the promisor, who retains the option of discontinuing performance." (citing 17A AM. JUR. 2D *Contracts* § 130, at 150-51 (2004))). This is inconsequential, however, because the mere act of hiring the drivers constituted consideration for the Driver Contracts.

The Court finds that all three elements necessary for formation of a valid contract are present with respect to the Driver Contracts. The contracts were, however, partially terminable at will and partially subject to an ongoing obligation. Because the drivers were at-will employees, plaintiff's claim that defendant actively recruited and hired plaintiff's drivers is best characterized as a claim for tortious interference with prospective economic advantage. *Compiano*, 588 N.W.2d at 464. The claim for interference with the restrictive covenants, on the other hand, amounts to a claim for interference with an ongoing contractual obligation and is best characterized as a claim for tortious interference with contract. *See Nesler*, 452 N.W.2d at 196-99. The Court will consider each claim consistent with these conclusions.

### *IV.* **CRST v. TransAm**

This Court recently considered whether to grant summary judgment in a companion case that presented factual allegations nearly identical to those alleged in this case. *See CRST Expedited, Inc. v. TransAm Trucking, Inc.*, No. C16-52-LTS, 2018 WL 3738017 (N.D. Iowa July 31, 2018) ("*TransAm*"). In *TransAm*, however, the parties did not directly address the applicability of the at-will employment doctrine. Rather, the plaintiff in that case—which is also the plaintiff in this case—summarily asserted that the contracts at issue were not at-will contracts. (*See TransAm*, No. 16-cv-52-LTS, Doc.

167, at 22 n.12, 38).  The Court therefore did not address whether the contracts were at-will contracts, in whole or in part.

In this case, by contrast, plaintiff has raised the at-will employment issue, and plaintiff has directly argued the applicability of the doctrine to the tortious interference claims.  (*See, e.g.*, *CRST v. Swift*, 17-cv-25-CJW-KEM, Doc. 159, at 23-24).  Indeed, plaintiff's briefing in this case highlights plaintiff's argument that even if a contract is partially terminable at will, "when the obligation to refrain from working for a competitor is not at-will, but, instead, an ongoing obligation, a competitor makes a second, conscious decision beyond acquiring services in the open market—the competitor causes the breach by hiring the applicant . . .."  (*Id.*, at 25).  Because plaintiff, here, raises the at-will employment issue in a non-conclusory fashion and now applies the at-will employment doctrine to the facts of this case, the Court finds it appropriate to address the issue.

It is this application of the at-will employment doctrine that leads the Court to reach a different conclusion now than it did when considering *TransAm*.  The Court notes, specifically, that when the drivers' status as at-will employees is considered separately from the restrictive covenants, the causation analysis reaches a different conclusion as to the restrictive covenants.  That is, because plaintiff now successfully argues that the restrictive covenants were not terminable at will, the Court will address causation separately as to the restrictive covenants under plaintiff's tortious interference with contract claim.  The Court did not do so in *TransAm* because the plaintiff did not fully set forth this argument, and the plaintiff did not address how the ongoing nature of the restrictive covenants impacted the causation analysis.  The Court's causation analysis in *TransAm* closely mirrors the causation analysis the Court now engages in under plaintiff's tortious interference with prospective economic advantage claim.  *See TransAm*, 2018 WL 3738017, at *15-17.

# V. DISCUSSION OF CLAIMS

## A. Intentional Interference with Contract

Under Iowa law, the elements of intentional interference with contract are:

> 1) the plaintiff had a valid contractual relationship with a third party; 2) the defendant knew of that relationship; 3) the defendant intentionally interfered with that relationship; 4) the defendant's action caused the third party to breach its contractual relationship with the plaintiff or disrupted the contractual relationship between the third party and the plaintiff by making performance more burdensome or expensive; and 5) . . . damages.

*Gen. Elec. Capital Corp.*, 485 F. Supp. 2d at 1025 (citations omitted). Defendant argues that plaintiff's interference with contract claim fails as a matter of law on each of the five elements. (Doc. 140, at 14-37). As discussed above, the Court will consider only plaintiff's claim that defendant tortiously interfered with the drivers' restrictive covenants under the intentional interference with contract claim. Plaintiff's claim that defendant interfered with the drivers' agreement to work for plaintiff will be considered under the tortious interference with prospective economic advantage claim.

### 1. Contract Validity and Enforceability

The bulk of the parties' arguments, including those in plaintiff's own motion for summary judgment, revolve around the validity of the Driver Contracts. In its affirmative motion, defendant asserts that the contracts are void 1) as a matter of law because the non-competition provisions are unsupported by a protectable interest, and 2) as against public policy. These flaws in the non-competition provisions, defendant argues, invalidate the entirety of the contracts.

Plaintiff argues that defendant can be liable for tortious interference with contract if defendant improperly interfered with a contract that was not void *ab initio* and had not been avoided at the time of the interference. (Doc. 130, at 12-14). From this premise, plaintiff reasons that if a contract was not actually avoided before defendant's alleged

interference, defendant lacks standing to assert those defenses that would permit a contracting party to avoid a contract. (*Id.*). Plaintiff, consequently, seeks summary judgment as to defendant's affirmative defenses that would permit defendant to argue that the contracts are voidable. (*Id.*, at 14-23). In response, defendant maintains that the contracts were void from their inception, but argues that even if they were not, the Court should still find that the contracts are invalid. (Doc. 146, at 21-22). In support, defendant asserts that courts, including Iowa courts, no longer "emphasize the void versus voidable distinction," and that the *Restatement (Third) of Torts: Liability for Economic Harm* "does not even reference the void versus voidable distinction, but instead looks to whether the contract is 'valid.'" (*Id.*, at 22).

The Court rejects defendant's assertion that the void/voidable distinction is inapplicable. As this Court recognized in *TransAm*, "[t]he void/voidable distinction is far from outdated." 2018 WL 3738017, at *9. Iowa courts have continued to follow the *Restatement (Second) of Torts* for intentional interference cases. *See, e.g.*, *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 151 (Iowa 2013); *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 737 (Iowa 2009); *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 663-64 (Iowa 2008); *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 601 (Iowa 2000); *RTL Distrib., Inc. v. Double S Batteries, Inc.*, 545 N.W.2d 587, 590 (Iowa Ct. App. 1996). This Court has addressed the void/voidable distinction in this very case, as well as in two companion cases. *See TransAm*, 2018 WL 3738017, at *9-10; *CRST Expedited, Inc. v. JB Hunt Transp., Inc.*, Nos. 17-CV-26 CJW & 17-CV-24 CJW, 2018 WL 2768874, at *10-13 (N.D. Iowa June 8, 2018) ("*JB Hunt*"); *CRST Expedited, Inc. v. Swift Transp. Co. of Ariz., LLC*, No. 17-CV-25-CJW, 2018 WL 2016274, at *7-9 (N.D. Iowa Apr. 30, 2018) ("*Swift*"). Finally, the Court has been unable to find any Iowa caselaw adopting the *Restatement (Third) of Torts: Liability for Economic Harm*, which is still in draft form and has yet to be officially published. RESTATEMENT (THIRD)

OF TORTS: LIABILITY FOR ECONOMIC HARM (AM. LAW INST., Tentative Draft No. 3, 2018).

When addressing the void/voidability distinction in this case previously, the Court engaged in the following discussion:

> The *Restatement (Second) of Contracts*, Section 766, Intentional Interference with Performance of Contract by Third Person, Comment f provides as follows:
>
>> *Voidable contracts.* The word "contract" connotes a promise creating a duty recognized by law. The particular agreement must be in force and effect at the time of the breach that the actor has caused; and if for any reason it is entirely void, there is no liability for causing its breach. Furthermore, it must be applicable to the particular performance that the third person has been induced or caused not to discharge. *It is not, however, necessary that the contract be legally enforceable against the third person. A promise may be a valid and subsisting contract even though it is voidable.* The third person may have a defense against action on the contract that would permit him to avoid it and escape liability on it if he sees fit to do so. *Until he does, the contract is a valid and subsisting relation, with which the actor is not permitted to interfere improperly.* Thus, by reason of the statute of frauds, formal defects, lack of mutuality, infancy, unconscionable provisions, conditions precedent to the obligation or even uncertainty of particular terms, the third person may be in a position to *avoid* liability for any breach. *The defendant actor is not, however, for that reason free to interfere with performance of the contract before it is avoided.*
>
> (emphasis added) (internal citations omitted). *Peterson v. First Nat'l Bank of Iowa*, 392 N.W.2d 158, 165-66 (Iowa Ct. App. 1986). *See also Stone's Pharmacy, Inc. v. Pharmacy Accounting Mgmt., Inc.*, 875 F.2d 665, 668 (8th Cir. 1989). Further, the Supreme Court of Iowa has held that "[i]n the case of a voidable contract, if neither party seeks avoidance, the court cannot avoid the contract, and the contract remains valid." *Nichols v. City of Evansdale*, 687 N.W.2d 562, 571 (Iowa 2004) (citing *First State Bank*

*v. Shirley Ag Serv., Inc.*, 417 N.W.2d 448, 452 (Iowa 1987)).

>    Whether the contracts are voidable, therefore, is a separate issue from whether the contracts were valid at the time of the alleged wrongful interference.  Defendant appears to confuse the two concepts by arguing that should the drivers successfully argue that the contracts are substantively unenforceable, defendant cannot face any liability for its alleged interference.  On the other hand, if any of the drivers successfully avoided their contracts prior to defendant's alleged interference, defendant would not be liable for any alleged interference with those contracts.

*Swift*, 2018 WL 2016274, at *8.  When asked to address the void/voidability distinction in *TransAm*, this Court again reached the same conclusion.  *See TransAm*, 2018 WL 3738017, at *10.  The Court is unpersuaded that it should now abandon the void/voidability distinction.

Defendant has not identified any contract that defendant asserts was avoided.[5]  The issue, then, is twofold.  First, the Court must consider whether the contracts were void *ab initio*.  If the Court answers that question in the negative, the Court will then address which of defendant's affirmative defenses, if any, assert principles of law that would permit a contracting party to *avoid* a contract.  Those defenses that would permit a contracting party to avoid a contract cannot be properly asserted by defendant and must fail as a matter of law, unless defendant is able to identify contracts that it contends were avoided before defendant's alleged interference.

Defendant asserts that the contracts are void because the non-competition provisions contained within the contracts are not supported by a protectable interest, which, defendant argues, renders the contracts facially invalid.  (Doc. 140, at 27, 27 n.7-8, 30).  Defendant also argues that the contracts are void as a matter of law because the

---

[5] The Court notes that although defendant has not identified any contract that defendant contends was avoided, plaintiff has not come forward with conclusive evidence that no contract was avoided.  The Court, therefore, cannot conclusively find that defendant is unable to prove that any contract was avoided.

non-competition provisions operate as "indefinite, lifetime non-compete agreement[s]." (Doc. 140, at 30-33). The former argument addresses whether a non-competition provision renders a contract void when the reasons supporting the non-competition provision are insufficient, and the latter argument addresses whether a non-competition provision renders a contract void if the non-competition provision is in violation of public policy. The Court will address each issue in turn, considering whether either argument, if successful, would render the contracts void or merely voidable.

### a. Lack of Protectable Interest

Under Iowa law, non-competition provisions are measured against a reasonability standard. *Mut. Loan Co. v. Pierce*, 65 N.W.2d 405, 407 (Iowa 1954) ("It comes down to a question of reasonableness. The restraint will be enforced if reasonably necessary to afford a fair protection to the business interests of the party in favor of whom it is given."). *See also Ag Spectrum Co. v. Elder*, 191 F. Supp. 3d 966, 971 (S.D. Iowa 2016) (setting forth the relevant Iowa standards in assessing whether a contract is "enforceable"). If a non-competition provision is not reasonably necessary, it is "unenforceable." *Mut. Loan Co.*, 65 N.W.2d at 408. Iowa courts have not squarely addressed what it means for a contract to be "unenforceable." That is, Iowa law is unclear as to whether a contract is "unenforceable" because it is void, or whether the contract is "unenforceable" because an unreasonable non-competition provision permits avoidance.

The Court finds that the use of the term "unenforceable," as opposed to "void," is intentional. The Iowa Supreme Court has repeatedly recognized the distinction between contracts that are unenforceable versus those that are void. *See Mincks Agric. Ctr., Inc. v. Bell Farms, Inc.*, 611 N.W.2d 270, 273-74 (Iowa 2000) (recognizing that a contract is void if performance of the contract would require criminal conduct but explaining that a contract that violates a statutory provision without implicating criminal

law calls the contract's enforceability into question); *Mut. Loan Co.*, 65 N.W.2d at 407-08 (adopting rule that a contract is *unenforceable* if not reasonably necessary but recognizing that at least one other court found that restraints on competition are *void*, except in special circumstances). The Iowa Supreme Court, in explaining the reasonability standard for enforcement of non-competition provisions, seemed to adopt the rule that "[r]estraints on competition are *void*, except in the special case where they are necessary in order to prevent the employee from unjustly enriching himself at the expense of his former employer." *Mut. Loan Co.*, 65 N.W.2d at 408 (emphasis added) (quoting *John Roane, Inc. v. Tweed*, 80 A.2d 290, 293 (Del. Ch. 1951) (interpreting Maryland contract law), *rev'd* 89 A.2d 548 (Del. 1952)).

Reading *Mutual Loan* more closely, however, reveals that the Iowa Supreme Court did not, in fact, hold that restraints on competition are void where not necessary. Rather, the *Mutual Loan* court quoted the Delaware Court of Chancery's decision in *John Roane, Inc. v. Tweed* for illustrative purposes only. Further, the *Mutual Loan* court cited *John Roane* for the proposition that a non-competition provision must be reasonably necessary. *See Mut. Loan Co.*, 65 N.W.2d at 408. The *Mutual Loan* court did not reference *John Roane* to determine the legal implications of an improper non-competition provision. Had the *Mutual Loan* court intended to reference *John Roane* to determine the validity, as opposed to enforceability, of an improper non-competition provision, the *Mutual Loan* court likely would have discussed two separate principles.

First, the *Mutual Loan* court likely would have focused on the use of "void" in *John Roane* in an attempt to discern whether the *John Roane* court meant "void" in the traditional sense, or whether "void" was mistakenly used in place of "unenforceable." Second, the *Mutual Loan* court likely would have turned to the Delaware Supreme

Court's review of the Court of Chancery's *John Roane* decision.[6]  The Delaware Supreme Court, in reviewing the *John Roane* decision, spoke in terms of the "enforceability" of the contract at issue.  *John Roane, Inc. v. Tweed*, 89 A.2d 548, 550 (Del. 1952) ("[T]he essential question here concerns the enforceability of a contract admittedly in partial restraint of trade and competition.").  The Delaware Supreme Court did not adopt the lower court's holding that "[r]estraints on competition are void" when special circumstances cannot be shown.  *John Roane, Inc.*, 80 A.2d at 293.

Had the Iowa Supreme Court intended to rely upon the Delaware Court of Chancery's proclamation regarding the validity of contracts, the Iowa Supreme Court likely would have either attempted to distinguish Iowa contract law from Maryland contract law, or would have explained the basis for the Iowa Supreme Court's disagreement with the Delaware Supreme Court.  That the Iowa Supreme Court made no attempt to analyze the use or meaning of the term "void" indicates that the word "void" was not the Iowa Supreme Court's focus in *Mutual Loan* and was included in the opinion merely because the term was encompassed within a relevant quotation.

Moreover, in *Mutual Loan*, the Iowa Supreme Court referenced whether a contract would be "void," as discussed above, but went on to speak in terms of a contract's *enforceability*.  That the court contemplated both validity and enforceability in the same decision indicates that the court spoke in terms of "enforceability," and reached a holding based on "enforceability," intentionally.  The Iowa Supreme Court just as easily could have spoken in terms of validity and reached a holding based on the validity of the contract at issue.  The court did not do so, however, and the case law leaves this Court persuaded that "void" and "unenforceable" are not synonymous in the Iowa non-

---

[6] The Court notes that the Delaware Supreme Court's *John Roane* decision was issued two years before the Iowa Supreme Court's *Mutual Loan* decision.  Thus, the Delaware Supreme Court's decision was available to the Iowa Supreme Court when the Iowa Supreme Court decided *Mutual Loan*.

competition clause context.

Finally, this Court has been unable to find any Iowa state court decision, Iowa federal court decision, or Eighth Circuit Court of Appeals decision, other than *Mutual Loan*, referencing the lower court's *John Roane* decision,[7] or holding that an improper non-competition provision would render a contract—or the non-competition provision alone—void. If Iowa courts were of the opinion that a problematic non-competition provision renders a non-competition clause void, the Court finds it likely that this opinion would have been articulated in more than one decision and would not have been mentioned only in passing. The Court concludes that under Iowa law, a non-competition clause that is not reasonably necessary may be rendered unenforceable, but a finding that the clause is not reasonably necessary does not, alone, serve to void either the non-competition clause or the contract as a whole.[8]

---

[7] The Iowa Supreme Court has, on one occasion, referenced the Delaware Supreme Court's *John Roane* decision. *See Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 370 (Iowa 1971) (referring to *John Roane, Inc. v. Tweed* as *Roane, Inc. v. Tweed*). It is the lower court's *John Roane* decision, however, that this Court is concerned with.

[8] The *Restatement (Second) of Contracts*, Section 8 addresses this very issue. Section 8 reads: "An unenforceable contract is one for the breach of which neither the remedy of damages nor the remedy of specific performance is available, but which is recognized in some other way as creating a duty of performance, though there has been no ratification." Comment a to Section 8 elaborates:

> a. *Distinction between "voidable" and "unenforceable."* Just as a contract may be voidable by one party or by either party, so it may be enforceable by one and not by the other or it may be unenforceable by either. Similarly, one party to an unenforceable contract may have a power to make the contract enforceable by all the usual remedies, and both voidable and unenforceable contracts may have collateral consequences. Voidable contracts might be defined as one type of unenforceable contract. As defined here, however, the term unenforceable contract refers to rules under which the duty of performance does not depend solely on the election of one party. In the transactions here classified as unenforceable, some legal consequences other than the creation of a power of

As this Court has repeatedly found, if a third party interferes with a valid contract, that third party may be liable for tortious interference, if all other elements of the claim are met. The Court now finds that although a non-competition clause can be rendered unenforceable if it is not reasonably necessary, the lack of reasonable necessity does not render the contract void. Thus, the contract would remain a valid agreement and the contracting party against whom enforcement is sought could argue that the non-competition provision is unenforceable as to him. This defense, however, would not relieve an alleged tortious interferer because, as set out above, "[a] promise may be a valid and subsisting contract even though it is voidable." RESTATEMENT (SECOND) OF TORTS, § 766, cmt. f (AM. LAW INST. 2018).

Defendant argues that an unenforceable contract cannot support a claim for tortious interference with contract. (Doc. 140, at 24-25, 25 n.5 (citing *Iowa Office Supply, Inc. v. Access Techs., Inc.*, No. EQCV150495, 2013 WL 6511495, at *5 (Iowa Dist. Feb. 22, 2013))). The *Restatement (Second) of Contracts* and Eighth Circuit precedent, however, counsel otherwise. *Rucker v. Taylor*, 828 N.W.2d 595 (Iowa 2013) (relying on numerous provisions of the *Restatement (Second) of Contracts*)). The *Restatement (Second) of Contracts* provides, and the Eighth Circuit has agreed, that "[w]here a party to a contract which is unenforceable against him refuses . . . to perform the contract . . ., the other party is justified in suspending any performance for which he has not already received the agreed return . . .." RESTATEMENT (SECOND) OF CONTRACTS, § 141(2) (AM. LAW INST. 2019); *Black v. Hesse*, 869 F.2d 420, 422 (8th Cir. 1989) (stating common law principle). Under the *Restatement (Second) of Contracts* and *Black v. Hesse*, a wronged party *may* suspend performance but is not required to. Until the wronged party chooses to suspend performance, then, the parties are free to operate as

---

ratification follow without further action by either party.

though the contract is fully enforceable. The recognition that the subject contract would be unenforceable as to only *one* contracting party also implies that the contract remains valid. This is because an invalid contract would not be enforceable against *any* party. Again, the Court finds a distinction between validity of a contract and enforceability.

In support of its position that an improper non-competition provision renders the provision, and the contract, void rather than voidable, defendant cites a number of cases. The first, *Iowa Office Supply, Inc. v. Access Technologies, Inc.*, is cited only for a sentence contained in the Iowa District Court's conclusion paragraph: "Because the agreement is unenforceable, [plaintiff's] claim for intentional interference with a contract must necessarily fail." (Doc. 140, at 24-25, 25 n.5). As discussed, the Court finds that there is a distinction between contracts that are unenforceable and those that are void. Further, the cited proposition is accompanied by no analysis and can be viewed as a conclusory holding that the defense of unenforceability falls into the "void category." The Court declines to adopt this conclusory holding when the state case law and *Restatement (Second) of Contracts* instruct that the Court should reach a different conclusion.

Next, defendant turns to a case from the Fifth Circuit Court of Appeals, *NCH Corp. v. Share Corp.*, 757 F.2d 1540 (5th Cir. 1985), for the proposition that "unreasonable noncompetes are void rather than voidable 'because of the public policy against restraints of trade,' and [can] not support tortious interference claim[s]." (Doc. 140, at 26 (quoting *NCH Corp.*, 757 F.2d at 1543)). The Court recognizes that the Fifth Circuit, in applying Texas law, held that a defendant could assert unenforceability as a defense to a tortious interference with contract claim. *NCH Corp.*, 757 F.2d at 1543-44. Defendant does not, however, argue that the Court should apply Texas law to determine the validity of the contracts at issue. Indeed, defendant does not argue in favor of application of any specific body of law. As noted above, the Court is, thus, applying

Iowa law throughout its analysis, including in determining the validity of the contracts. Had defendant argued in favor of applying Texas law to determine the validity of the contracts, perhaps the outcome would be different. Under Iowa law, however, defendant is precluded from asserting unenforceability as a defense in this action.

Defendant cites to five other cases in support of its argument that the absence of a protectable interest renders a non-competition clause, and the accompanying contract, void. (*See* Doc. 140, at 26, 27 n.7-8, 30). Each of the cited cases, however, relies on the laws of a state other than Iowa. *Spectrum Creations, L.P. v. Carolyn Kinder International, LLC*, No. SA-05-CV-750-XR, 2008 WL 416264 (W.D. Tex. Feb. 13, 2008), was decided by a federal court sitting in Texas that applied Florida law, in relevant part. *See* 2008 WL 416264, at *66. Two of defendant's other cited cases, *GPS Industries, LLC v. Lewis*, 691 F. Supp. 2d 1327 (M.D. Fla. 2010), and *In re Maxxim Medical Group, Inc.*, 434 B.R. 660 (M.D. Fla. 2010), likewise applied Florida law. As has already been discussed, the Court is applying Iowa law throughout its analysis, and the Court does not find it necessary to look beyond the Iowa case law to determine whether defendant can assert the defense of unenforceability. Even if the Court were inclined to look beyond the Iowa case law, however, these three cases would be of limited value to the Court.

Florida has codified limitations on restrictive covenants: "Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable." FLA. STAT. § 542.335(1)(b). Each of the three cases decided under Florida law cite to this statute in addressing the validity of the restrictive covenants at issue. *In re Maxxim Med. Grp., Inc.*, 434 B.R. at 684-85, 685 n.182; *GPS Indus., LLC*, 691 F. Supp. 2d at 1333; *Spectrum Creations, L.P.*, 2008 WL 416264, at *66. Iowa does not have an analogous statute that addresses the legal effects of a restrictive covenant that is not supported by a protectable interest. The cases decided under Florida law, then, are not

on point because they were decided with reference to a law that is not implicated here.

Defendant cites to *Rebsamen Insurance v. Milton*, 600 S.W.2d 441, 444 (Ark. Ct. App. 1980), in which the Arkansas Court of Appeals held that a restrictive covenant was unreasonable and therefore "against public policy, unenforceable and void." To determine whether to uphold the restrictive covenant at issue, the *Rebsamen* court considered the reasonableness of the covenant. 600 S.W.2d at 443-44. The *Rebsamen* court ultimately concluded that the restrictive covenant was "broader than necessary to protect [the plaintiff's] legitimate business interests," which led the court to conclude that the restrictive covenant was unreasonable. *Id.* at 444.

Although the test employed by the *Rebsamen* court is similar to the test employed under Iowa law, the *Rebsamen* court did not explain why it found the contract "unenforceable and void." *Id.* There is no indication that the *Rebsamen* court found a distinction between contracts that are "unenforceable" and those that are "void." As discussed *supra*, however, the Court is persuaded that Iowa law does distinguish between contracts that are "unenforceable" and those that are "void." *Rebsamen* is, thus, distinguishable.

Finally, defendant cites to *Cytimmune Sciences, Inc. v. Paciotti*, No. PWG-16-1010, 2016 WL 4699417, at *2 (D. Md. Sept. 8, 2016), in which the District of Maryland held that a restrictive covenant was not enforceable because it was not supported by a legally protected interest and was contrary to public policy. The *Cytimmune Sciences* court, however, was faced with a very different issue than this Court is confronted with. In *Cytimmune Sciences*, the plaintiff brought a motion for preliminary injunction to enforce a restrictive covenant that would have prevented the defendant from working for a competitor. Because the movant only sought to *enforce* the restrictive covenant, the *Cytimmune Sciences* court did not need to consider whether the unenforceability of the restrictive covenant would render either the restrictive covenant or the entire contract

void. Instead, the court could—and did—decide only the narrower question of whether to enforce the restrictive covenant. *See id.* at *4. *Cytimmune Sciences*, then, does not assist this Court in determining whether the contracts in this case would be rendered void, as opposed to voidable, if the Court were to find that the restrictive covenants were unenforceable.

The Court rejects defendant's argument that defendant is entitled to summary judgment because the potential lack of a protectable interest renders the contracts void. The Court, instead, finds that any lack of a protectable interest would render the contracts voidable. As defendant does not argue that any contracts at issue were avoided before defendant's alleged interference, defendant cannot presently rely upon the defense of a lack of a protectable interest. *See Nichols*, 687 N.W.2d at 571 (holding that when a contract has not been avoided, the contract remains valid (citation omitted)). The Court need not consider whether plaintiff has a protectable interest sufficient to support the non-competition provisions because the Court's conclusion on this issue would be of no consequence as to the issues before the Court.

### b. Violation of Public Policy

Defendant next argues that the contracts are void as a matter of law because the non-competition provisions "operate[ ] as . . . indefinite and lifetime non-competition restriction[s], again violative of the public interest." (Doc. 140, at 26). Additionally, defendant argues that the contracts are procedurally and substantively unconscionable, which renders them void as a matter of law. (*Id.*, at 26 n.6; *see also* Doc. 146, at 17-21). The Court rejects both arguments.

When addressing the defense of unconscionability, Iowa courts consider whether to *enforce* contracts. *See, e.g.*, *Lakeside Boating & Bathing, Inc. v. Iowa*, 402 N.W.2d 419, 422 (Iowa 1987) ("We have held that a bargain will be deemed unenforceable if it is such as no man in his senses and not under delusion would make on the one hand, and

as no honest and fair man would accept on the other." (citations and internal quotation marks omitted)). *See also In re Marriage of Shanks*, 758 N.W.2d 506, 513 (Iowa 2008) ("We next consider whether the agreement is unconscionable and therefore unenforceable."). The Court has already determined that "unenforceable" is not synonymous with "void." The Court thus concludes that an unconscionability defense permits a party to *avoid* a contract, but an unconscionability defense, if successful, does not render the underlying contract *void*. This is consistent with this Court's holding in *TransAm* and with the *Restatement (Second) of Torts*. *See TransAm*, 2018 WL 3738017, at *10; RESTATEMENT (SECOND) OF TORTS § 766 cmt. f ("[B]y reason of . . . unconscionable provisions, . . . the [contracting party] may be in a position to avoid liability for any breach. The defendant actor is not, however, for that reason free to interfere with the performance of the contract before it is avoided."). Because defendant has not argued that any driver avoided his contract with plaintiff, the defense of unconscionability would be of no benefit to defendant, and defendant does not have standing to raise the defense, unless defendant can show that one or more drivers avoided his contract.

Defendant next argues that the restrictive covenants are "indefinite, lifetime non-compete agreement[s]," that violate public policy. (Doc. 140, at 30). This argument, if successful, would render the non-competition clauses void from their inception. *See Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 684 n.4 (Iowa 2001). The invalidity of the non-competition clauses would relieve defendant from liability on plaintiff's tortious interference with contract claim because the entirety of plaintiff's contract claim rests on the restrictive covenants. Because no other contractual provision is implicated in the contract claim, whether the invalidity of the restrictive covenants would render any other contract term invalid or void is irrelevant. The Court, however, finds that the restrictive covenants do not operate as "indefinite, lifetime non-compete agreements."

(Doc. 140, at 30).

Defendant argues that plaintiff's interpretation of the restrictive covenants turns the restrictive covenants into a lifetime ban of each driver-signatory from the trucking industry. (Doc. 140, at 31-33). The restrictive term contained in the contracts reads as follows:[9]

> The term of [plaintiff's] employment of Employee under this Contract shall be for a period of ten (10) months commencing as of the Effective Date (the "Term") . . .. Following the Term, [plaintiff] shall employ Employee on an at-will basis, and either party may terminate the employment relationship at any time effective immediately[.]

(Doc. 130-2, at 51). The "Effective Date" is the date a driver enters into the contract. (*Id.*). The contracts go on to state that "Employee agrees and covenants that for a period equal to the greater of the [r]estrictive [t]erm and the duration of [plaintiff's] employment of Employee, Employee will not directly or indirectly provide truck driving services to any CRST Competitor within the continental United States of America." (*Id.*). The "[r]estrictive [t]erm" is defined as "the Term including any period of the Term remaining after the termination of [plaintiff's] employment of Employee with or without cause by either party . . .." (*Id.*, at 52). The Term can lapse if the employee pays back the full amount that plaintiff advanced for that driver's training. (*Id.*).

Defendant argues that plaintiff's interpretation of the restrictive covenants is such that, for example, a driver with a ten-month restrictive term who leaves plaintiff's employ after five months cannot work for one of plaintiff's competitors until the driver returns to plaintiff and works for another five months. (Doc. 140, at 31). Thus, even a driver

---

[9] As explained above, some contracts are for a term of ten months and others are for a term of eight months. (*Compare* Doc. 130-2, at 51, *with id.*, at 57). This difference is immaterial in considering whether the restrictive covenants operate as a lifetime ban. Further, the parties do not argue that this difference is material, nor do the parties point to any other differences in the restrictive covenants contained in the various contracts at issue.

who left plaintiff's employ ten years ago would be barred from working for a competitor if the driver had any time remaining on his restrictive term. (*Id.*). In support, defendant cites to the testimony of plaintiff's former chief executive officer, who provided that "if a driver does not either complete his contract term or pay off his contract, he cannot work for another motor carrier for the rest of his life."[10] (Docs. 140, at 31; 140-1, at 16; 140-2, at 16).

In response, plaintiff states that "equating [the contractual exclusive driving and non-compete] terms to a lifetime ban ignores obvious and critical contract terms." (Doc. 159, at 18). Plaintiff goes on to explain that the restrictive covenants are only applicable to plaintiff's competitors and not to the motor carrier industry as a whole. (*Id.*). Additionally, plaintiff reiterates that a driver-signatory can "simply pay off [his] contract, thus extinguishing the brief ten (10) month exclusive driving commitment." (*Id.*). Plaintiff does not directly address whether it interprets the restrictive covenants to extend, potentially, for life. Nor does plaintiff address whether its own interpretation of the restrictive covenants matters when considering the validity of the covenants or the underlying contracts.

The plain meaning of the restrictive covenants does not support defendant's "lifetime ban" interpretation. *See Pro-Edge L.P. v. Gue*, 419 F. Supp. 2d 1064, 1084-85 (N.D. Iowa 2006) ("[I]n interpreting written contracts[,] . . . the intent of the parties controls, [but] this intent is determined by the language of the contract unless it is ambiguous. . . . [I]t is a court's duty to give effect to the language of the contract in

---

[10] The Court notes that the witness did not, himself, make this statement. Rather, defense counsel asked: "And, in fact, it is the position of CRST that if a driver does not either complete his contract term or pay off his contract, he cannot work for another motor carrier for the rest of his life?" (Doc. 140-2, at 16). The witness responded "Correct." (*Id.*). Plaintiff does not take issue with this characterization of the testimony, however, and the Court will therefore consider the characterization to be inconsequential.

accordance with its plain and ordinary meaning." (citations omitted)); *DuTrac Cmty. Credit Union v. Radiology Grp. Real Estate, L.C.*, 891 N.W.2d 210, 216 (Iowa 2017) (recognizing that restrictive covenants are contracts and that contract-based rules of construction should apply). The restrictive covenants limit the time a driver agrees not to compete with plaintiff to the greater of "a period equal to" 1) the time remaining on the Restrictive Term, or 2) "the duration of [plaintiff's] employment of Employee." (Doc. 130-2, at 51). The Court finds that this language is not ambiguous and, thus, the language of the restrictive covenants determines the intent of the contracting parties.

Defendant addresses only the first possibility in arguing that the restrictive covenants operate as a "lifetime ban." The plain, commonly understood meaning of "a period equal to" would mean, for example, that a driver with a ten-month restrictive term who leaves plaintiff's employ after five months would be bound for five months after his employment ended. The plain, commonly understood meaning does not support an interpretation that the driver would be bound indefinitely until he either returned to work for plaintiff for an additional five months or repaid plaintiff for the costs of the driver's training. Indeed, the drivers at issue here are only those who ceased working for plaintiff while still within their restrictive terms. (*See* Docs. 130, at 3 n.1; 130-7, at 75-79 (identifying the drivers at issue)). Even if plaintiff's employees, including its chief executive officer, interpret the restrictive terms more expansively, the plain meaning of those covenants controls. The plain meaning of the restrictive terms does not support defendant's "lifetime ban" theory.

Defendant does not advance any other arguments as to why the Court should find that the contracts were void *ab initio*, and the Court thus concludes that they were not void *ab initio*. Defendant has not carried its burden of establishing that plaintiff lacked a valid contractual relationship with each driver at the time of defendant's alleged interference, and defendant is, thus, not entitled to summary judgment on the first element

of plaintiff's tortious interference with contract claim. Defendant's motion for summary judgment is **denied** to the extent it seeks a finding that plaintiff did not have a valid contractual relationship with each of the drivers at issue.

Plaintiff's motion for partial summary judgment seeks, in part, to establish the existence of valid contractual relationships with the drivers. The Court finds that plaintiff is entitled to summary judgment to the extent plaintiff's motion seeks to establish that the Driver Contracts, and the restrictive covenants contained therein, are valid. Plaintiff's motion is **granted** to this limited extent. Plaintiff is not, however, entitled to a finding that plaintiff had valid contracts with the drivers for the drivers' continued employment because, as explained above, the drivers were at-will employees.

### 2. Knowledge

Plaintiff argues that defendant had actual and constructive knowledge of the contracts at issue at the time of defendant's alleged interference. (Doc. 159, at 18-21). The Iowa Supreme Court has directly addressed the issue of constructive knowledge in the context of tortious interference with contract: "It is not necessary that the [d]efendant had actual knowledge of the specific contract. It is sufficient that the [d]efendant had knowledge of facts which, if followed by reasonable inquiry, would have led to the disclosure of the contractual relationship . . .." *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 764 (Iowa 1999) (citation and internal quotation marks omitted).

Defendant agrees that plaintiff sent defendant "Contract Notice Letters" advising defendant that certain drivers were "under contract" with plaintiff.[11] (Doc. 140, at 3).

---

[11] Defendant has not advised whether a "Contract Notice Letter" was sent for each driver at issue here. From prior proceedings in this case, the Court understands that defendant inquires as to a driver's past employment history with other trucking companies before hiring the driver. Mistakes can happen, however, especially when dealing with such a large volume of drivers. Defendant does not argue that it was not advised that any of the drivers at issue were "under contract," and the Court will therefore assume that defendant received a "Contract Notice Letter" for each of the 250 drivers at issue here.

Defendant maintains, however, that it did not have notice of the restrictive covenants contained within the Driver Contracts. In doing so, defendant's argument is limited to asserting that "[n]othing in the record suggests [defendant] or anyone at [defendant] had any knowledge as to what 'under contract' means." (Doc. 140, at 33). In ascertaining whether the drivers at issue were subject to ongoing contractual obligations, however, defendant was not limited to the "Contract Notice Letters."

In response to an interrogatory, defendant stated "that it possesses a limited number of Driver Contracts . . . ." (Doc. 140-6, at 32). If defendant came into possession of these contracts before hiring the driver-signatories of those contracts, defendant would have had actual notice of the contracts and of the restrictive covenants contained therein. Defendant's argument that it did not have actual notice of the restrictive covenants because defendant did not know what "under contract" meant fails. Defendant had the contracts themselves and had every opportunity to interpret the relevant provisions itself. That defendant declined to do so, or declined to act upon the interpretation defendant attributed, does not equate to a lack of knowledge. At the very least, the Court finds that defendant could have had actual knowledge of those Driver Contracts that defendant received.

Further, a reasonable factfinder could conclude that the Driver Contracts are standardized such that each driver employed by plaintiff signs an identical contract. If the factfinder were to reach this conclusion, the factfinder could likewise find that actual notice of one contract provided defendant with constructive notice of all other contracts that defendant knew to exist. That is, if defendant had actual notice of any contract, regardless of whether a driver at issue was a signatory to that contract, receipt of the Contract Notice Letter for any other driver could vest defendant with constructive notice of the terms of the contract referenced in the Contract Notice Letter. Likewise, a reasonable factfinder could find that upon receipt of the Contract Notice Letters,

defendant should have inquired as to the meaning of "under contract," and that such an inquiry would have led defendant to learn of the restrictive covenants. Under *Revere Transducers*, this finding would be sufficient to establish the knowledge element of plaintiff's contract claim. 595 N.W.2d at 764.

Neither party has provided the Court with the date on which defendant first came into possession of one of the Driver Contracts, nor has either party otherwise given the Court enough information to determine, definitively, the earliest date on which defendant could have had either actual or constructive knowledge of the Driver Contracts and their terms. Indeed, based on the facts the Court has, a reasonable factfinder could conclude that defendant first received a Driver Contract before defendant recruited or hired any of the drivers at issue. Drawing all conclusions in plaintiff's favor, as the Court must, the Court finds that defendant is not entitled to summary judgment on the knowledge element of plaintiff's contract claim for any of the contracts at issue. Based on the evidence presented to the Court, there is a genuine issue of material fact as to whether defendant had actual, constructive, or inquiry notice of all of the Driver Contracts and the restrictive covenants contained therein.

### 3.     *Intentional and Improper Conduct*

This Court has previously addressed the issue of intentional and improper conduct in the context of tortious interference claims. *See, e.g.*, *Gen. Elec. Capital Corp.*, 485 F. Supp. 2d at 1026-27. Plaintiff must prove that defendant's conduct was intentional *and* improper to succeed on its tort claims; satisfaction of one standard without the other is insufficient to make out a *prima facie* case. *Id.* *See also Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 244 (Iowa 2006). That a defendant interferes intentionally does not necessarily mean that the interference was improper. *Gen. Elec. Capital Corp.*, 485 F. Supp. 2d at 1026-27; *Green*, 713 N.W.2d at 244 (citations omitted).

"The 'impropriety' or 'wrongfulness' of conduct alleged to be tortious interference

is determined according to somewhat different standards, depending upon whether the claim is for tortious interference with an existing contract or for tortious interference with a prospective or potential contract or business relationship." *Gen. Elec. Capital Corp.*, 485 F. Supp. 2d at 1026. To determine whether conduct was improper in the case of a tortious interference with contract claim, the factors to be considered include: 1) the nature of the conduct; 2) the defendant's motive; 3) the interests of the party with which the conduct interferes; 4) the interest sought to be advanced by the defendant; 5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the other party; 6) the nearness or remoteness of the defendant's conduct to the interference; and 7) the relations between the parties. *Green*, 713 N.W.2d at 244 (citing *Revere Transducers, Inc.*, 595 N.W.2d at 767; RESTATEMENT (SECOND) OF TORTS § 767).

"In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper." *Nesler*, 452 N.W.2d at 197 (quoting RESTATEMENT (SECOND) OF TORTS § 767 cmt. d). The Iowa Supreme Court has further elaborated:

> [I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

*Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996) (quoting RESTATEMENT (SECOND) OF TORTS § 767 cmt. d). *Accord Green*, 713 N.W.2d at 244. Finally, to show that the alleged interference was intentional requires plaintiff to establish that defendant's interference with plaintiff's "contractual relations was either desired by

[defendant] or known by him to be a substantially certain result of [defendant's] conduct." RESTATEMENT (SECOND) OF TORTS § 767 cmt. d. *See also Nesler*, 452 N.W.2d at 197.

Here, the questions of whether defendant's alleged interference was intentional and improper are questions of material fact that are genuinely in dispute. The Court, thus, is not permitted to answer those questions at the summary judgment stage. The question of defendant's motive, specifically, is so fraught with factual determinations that the Court could not properly determine the weight to attribute to this factor without weighing the facts of this case. Plaintiff argues, for instance, that defendant changed its hiring practices in August 2016 to permit defendant's recruiters to begin hiring plaintiff's drivers. (Doc. 159, at 24). This change in policy, plaintiff urges, shows that defendant was motivated by a desire to interfere with those drivers' restrictive covenants in the contracts the drivers had with plaintiff. (*Id.*). Importantly, plaintiff argues that defendant's knowledge of the contracts, in combination with the change in defendant's hiring practices, generates a genuine issue of material fact as to whether defendant's conduct was intentional and improper. (*Id.* ("[Defendant's] decision to hire [plaintiff's] drivers *knowing it would breach those drivers'* [*contracts*] with [plaintiff], alone, makes [defendant's] actions improper." (emphasis added))).

Plaintiff is correct. Although the evidence plaintiff turns to is circumstantial, the evidence is sufficient for a reasonable jury to find that defendant changed its hiring practices to facilitate interference with plaintiff's Drivers Contracts.[12] This conclusion, were the jury to reach it, would encompass findings of both intentional interference and

---

[12] As is discussed below, plaintiff's intentional interference with prospective economic advantage claim requires plaintiff to show that defendant acted with the intent to damage plaintiff. *Compiano*, 588 N.W.2d at 464. Should the jury find that defendant intended to interfere with the contracts, it does not necessarily follow that defendant did so because defendant wanted to damage plaintiff. Because the two concepts differ, the Court's differing conclusions on the two claims are not inconsistent with each other.

improper interference. If plaintiff shows that defendant had knowledge of the contracts and interfered with the contracts anyway, this showing will satisfy the intent prong. If plaintiff shows that defendant acted specifically for the purpose of interfering with the contracts, this showing will satisfy the impropriety prong. The Court thus finds that there are genuine issues of material fact as to whether defendant's conduct was intentional and improper, and summary judgment is therefore inappropriate as to this element.

Although these factual determinations do not make up the entirety of the improper interference element, these determinations are so integral that the Court could not determine, here, whether defendant's conduct was either intentional or improper without considering defendant's motive and desire to interfere. As the Court is not permitted to engage in such factual determinations at this stage as to material facts that are genuinely disputed, the Court is precluded from granting defendant's motion for summary judgment on the improper interference element. Defendant's motion is **denied** as to this element.

### 4. *Causation*

When considering a tortious interference with contract claim, the causation inquiry is whether the alleged tortfeasor's actions caused the breaching party not to perform his contract, or made performance more burdensome or expensive. *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 399 (Iowa 2001). Here, then, the Court's inquiry is whether plaintiff can produce sufficient evidence such that a reasonable jury could find that defendant's alleged interference caused the drivers not to perform, or that defendant's alleged interference made performance more burdensome or expensive. *See Anderson*, 477 U.S. at 249. That is, the issue is whether defendant's act of hiring the drivers caused the drivers to breach their restrictive covenants.

The *Restatement (Second) of Torts* is instructive on the issue of causation:

> An employment contract . . . may be only partially terminable at will. Thus it may leave the employment at the employee's option but provide that he is under a continuing obligation not to engage in competition

with his former employer. Under these circumstances a defendant engaged in the same business might induce the employee to quit his job, but he would not be justified in engaging the employee to work for him in an activity that would mean violation of the contract not to compete.

§ 768 cmt. i.

Here, the restrictive covenants prohibit driver-signatories from "directly or indirectly provid[ing] truck driving services to any CRST Competitor within the continental United States of America." (Doc. 130-2, at 51). The wording of the restrictive covenants makes it impossible for a driver-signatory to be in breach without the assistance of a "CRST Competitor." That is, even if a driver-signatory were to quit working for plaintiff, the only way he could breach his restrictive covenant would be by beginning work for a "CRST Competitor" during the driver's restrictive term. He could not do this unless a competitor agreed to hire him. As a result, the competitor's act of hiring the driver-signatory could directly cause a driver-signatory to breach his restrictive covenant. The Court, thus, finds that defendant's act of hiring drivers who were still within their restrictive terms could be sufficient to establish the causation element of plaintiff's tortious interference with contract claim. *See Books Are Fun, Ltd. v. Rosebrough*, No. 4:05-cv-00644-JEG, 2007 WL 9711266, at *36 (S.D. Iowa Mar. 29, 2007) (finding that the defendant could be liable for tortious interference with contract by inducing employees to become independent contractors with the defendant while bound by non-competition agreements with the plaintiff). *See generally Revere Transducers, Inc.*, 595 N.W.2d at 768 (citing persuasive authority for the proposition that "defendant, a competitor of plaintiff, had [a] right to persuade plaintiff's employees to work for defendant, so long as defendant did not induce employees to breach any existing contracts").

This finding extends to all drivers who were within their restrictive terms when defendant hired them, regardless of whether the drivers left plaintiff and immediately

began working for defendant, left plaintiff and refrained from driving for a period before beginning to work for defendant, or left plaintiff and worked for a different trucking company for a period before beginning to work for defendant. If the Court were to hold that defendant could not be held liable for causing the latter two groups of drivers to breach their restrictive covenants, the focus would shift from considering whether the drivers were still bound by their restrictive covenants when hired by defendant to whether the drivers were still employed by plaintiff when they were hired by defendant.

Whether the drivers were employed by plaintiff when the drivers breached their contracts could be relevant to whether defendant hiring the drivers was the actual cause of the drivers breaching their contracts. Plaintiff's *prima facie* case, however, requires the existence of a valid contract, not an existing employment relationship. The validity of the contracts at issue—the restrictive covenants—turns on whether each driver's restrictive term had lapsed by the time defendant hired him. If the Court were to hold that defendant could not be held liable for the latter two groups of drivers breaching their restrictive covenants, the Court would be holding that the fact of employment is an essential element of plaintiff's contract claim. As explained *supra*, this is not the case.

The Court notes, however, that a reasonable jury could find that the drivers would have breached their restrictive covenants by going to work for a different CRST Competitor, even if defendant had not hired those drivers. This conclusion would be wholly consistent with the Court's recognition that defendant's act of hiring the drivers *could* lead the drivers to breach their restrictive covenants, which is different from the factual determination of whether the act of hiring the drivers *actually* led the drivers to breach their restrictive covenants. The issue of whether defendant hiring the drivers actually caused the drivers to breach their contracts is a factual question that must be submitted to the factfinder. Defendant's motion for summary judgment is, thus, **denied** on the element of causation.

## 5. *Damages*

Finally, defendant asserts that plaintiff cannot establish that plaintiff incurred damages as a result of defendant's alleged interference. (Doc. 140, at 35-37). At the heart of defendant's argument is the assertion that plaintiff's alleged damages are too speculative to sustain recovery. Further, a close reading of defendant's brief reveals that defendant's damages argument is made only with respect to damages plaintiff allegedly sustained by plaintiff's drivers leaving plaintiff to work for defendant. (*See, e.g.*, Doc. 140, at 35 ("[Plaintiff] is apparently seeking damages for the profits it claims it would have earned if the [d]rivers had not gone to [defendant].")). That argument, however, is more properly attributed to plaintiff's prospective economic advantage claim. Defendant's argument does not address damages sustained under plaintiff's tortious interference with contract theory.

Plaintiff's contract claim is concerned with breaches of the restrictive covenants and damages that resulted from defendant's alleged conduct leading to those breaches. If the drivers ceased working for plaintiff but did not begin working for defendant while still within their restrictive terms, those drivers would not be encompassed by plaintiff's contract claim, but they could be encompassed by plaintiff's prospective economic advantage claim. Whether the drivers stopped working for plaintiff, then, is inconsequential to plaintiff's damages under the contract claim. A proper measure of damages for the contract claim would center around the contract at issue. For instance, the value attributed to the restrictive covenants, including the value the restrictive covenants hold, if any, in discouraging drivers from leaving plaintiff's employ,[13] could be a proper measure of damages. Defendant has not argued that plaintiff is unable to

---

[13] The Court notes that the fact of drivers leaving plaintiff's employ in spite of the restrictive covenants could be relevant to determining whether the restrictive covenants are effective in encouraging retention. This, however, is a different inquiry than assessing damages stemming from the drivers leaving plaintiff's employ.

prove a proper measure of damages relating to breaches of the restrictive covenants and summary judgment is, therefore, improper as to the damages element of plaintiff's contract claim.

The Court will, however, note that plaintiff's argument that the damages are too speculative would fail, even if defendant had advanced that argument with respect to damages associated with the restrictive covenants themselves.

> As a general rule, the party seeking damages bears the burden of proving them; if the record is uncertain and speculative as to whether a party has sustained damages, the factfinder must deny recovery. There is a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. If the uncertainty lies in the amount of damages sustained, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated. Thus, some speculation on the amount of damages sustained is acceptable, but a plaintiff cannot recover overly speculative damages.

*St. Malachy Roman Catholic Congregation of Geneseo v. Ingram*, 841 N.W.2d 338, 351 (Iowa 2014) (alteration and internal citations and quotation marks omitted).

A reasonable factfinder could find that plaintiff suffered damages from the drivers breaching their restrictive covenants, and defendant does not argue otherwise. As the example above shows, a reasonable factfinder could determine that the restrictive covenants have value because they encourage driver retention, which likely increases plaintiff's profit margin. The Court likewise finds that the factfinder could attribute a reasonably certain measure of damages to plaintiff's alleged harm. One possible method of calculating those damages would be to consider the liquidated damages provision in the restrictive covenants. The liquidated damages figure has already been set forth and is a definitive dollar amount. (*See, e.g.*, Doc. 130-2, at 52). Should plaintiff choose to pursue the liquidated damages as its theory of recovery, plaintiff's damages would not be speculative because the factfinder would have a basis from which to infer or approximate

damages. Based on the Court's finding that a reasonable factfinder could find that plaintiff suffered damages, and that a reasonable basis for the measure of those damages exists, the Court finds that defendant is not entitled to summary judgment on the damages element of plaintiff's contract claim. Defendant's motion for summary judgment is, thus, **denied** as to the damages element of plaintiff's contract claim.

The Court has addressed each element of plaintiff's tortious interference with contract claim, and the Court has found that defendant's arguments fail as to each element. Defendant has failed to defeat any essential element of plaintiff's tortious interference with contract claim, and the claim may properly proceed to trial. The Court reiterates, however, that this holding extends only to the issue of whether defendant tortiously interfered with the restrictive covenants that may have existed between the drivers at issue and plaintiff. Plaintiff's claim that defendant wrongfully induced the drivers to leave plaintiff's employ and instead begin working for defendant is more properly considered under plaintiff's prospective economic advantage claim and is not contemplated in this section. Defendant's motion for summary judgment as to the tortious interference with contract claim is **denied**.

### B. *Intentional Interference with Prospective Economic Advantage*

Under Iowa law, the elements of intentional interference with prospective economic advantage are 1) the plaintiff had a prospective contractual or business relationship; 2) the defendant knew of the prospective relationship; 3) the defendant intentionally and improperly interfered with the relationship; 4) the defendant's interference caused the relationship to fail to materialize; and 5) damages. *Gen Elec. Capital Corp.*, 485 F. Supp. 2d at 1025 (citations omitted).

As the Court has already explained, the drivers were at-will employees and any relationship plaintiff may have had with the drivers was prospective. The facts here could support a reasonable factfinder's determination that a prospective relationship actually

existed. For example, the drivers were employed by plaintiff for at least some period of time. Any potential for that employment relationship to continue would lend itself to a finding that a prospective relationship existed. Likewise, the Court finds that a reasonable factfinder could find that defendant knew of the prospective relationship. The Court's analysis on this second element is identical to the Court's analysis of the knowledge element of plaintiff's contract claim.

As to damages, the Court finds that although certain theories of recovery could be overly speculative, plaintiff could pursue a theory of recovery based on the liquidated damages clauses contained in the Driver Contracts. This theory would be proper because the liquidated damages could be found to be based on plaintiff's expectation that the drivers would each work for plaintiff for the entire duration of his restrictive term. Failure to do so could be found to implicate the liquidated damages provision.

Plaintiff must also show that defendant's interference was intentional and improper. Tortious interference with prospective economic advantage claims require a higher standard of proof than tortious interference with contract claims. Under prospective economic advantage claims, the plaintiff is required to produce "substantial evidence that the defendant's predominant or sole motive was to damage the plaintiff." *Compiano*, 588 N.W.2d at 464.

Assuming, for the sake of argument, that defendant's interference was intentional, plaintiff has produced no evidence that would permit a reasonable factfinder to determine that defendant was motivated, even in part, to damage plaintiff. Indeed, plaintiff's theory as to defendant's motive is speculative and addresses the knowledge component of the prospective economic interference claim, as opposed to the motive component of the claim. (*See* Doc. 159, at 41-43). Although plaintiff asserts that the circumstantial evidence would permit a reasonable jury to conclude defendant was acting under an improper motive, the evidence plaintiff turns to is probative on the knowledge component

of the claim. (*Id.*). Plaintiff fails to draw a connection between the circumstantial evidence of defendant's knowledge and any motive at all, much less an improper motive. (*Id.*). Plaintiff's inability to make a showing of defendant's motive renders plaintiff wholly incapable of showing that defendant's primary or sole motive was to injure plaintiff. The Court thus finds that plaintiff's tortious interference with prospective economic advantage claim fails on the element of improper conduct.

Finally, the Court will turn to the causation element, which also fails. Although the parties have briefed the issue of causation under different standards, the issue of factual causation is the same under both standards and is dispositive here.[14] (*Compare* Doc. 140, at 15-17 *with* Doc. 159, at 22-25). The Iowa Supreme Court has addressed factual causation:[15]

> "But for" is an absolute minimum for causation because it is merely causation in fact. Any attempt to find liability absent actual causation is an attempt to connect the defendant with an injury or event that the defendant had nothing to do with. Mere logic and common sense dictate[ ] that there be some causal relationship between the defendant's conduct [and] the injury or event for which damages are sought.

*Rieger v. Jacque*, 584 N.W.2d 247, 251 (Iowa 1998) (citation and internal quotation marks omitted).

---

[14] In *Thompson v. Kaczinski*, 774 N.W.2d 829, 836-38 (Iowa 2009) the Iowa Supreme Court adopted a modified approach to considering proximate cause in cases addressing physical and emotional harm. The Iowa Supreme Court has not been called on to determine if this modified approach also applies to cases involving purely economic torts. This Court need not consider the issue, however, because factual causation is dispositive.

[15] In *TransAm*, this Court found that "nothing in *Thompson*, or the subsequent decisions of the Iowa Supreme Court, [suggests] that Iowa's adoption of the causation principles set forth in the [*Restatement (Third) of Torts: Liability for Physical and Emotional Harm*] has changed the traditional analysis of factual causation under Iowa law." 2018 WL 3738017, at *15. The Court's conclusions remain unchanged, even when considering cases that were decided after *TransAm*.

The only interference at issue under plaintiff's prospective economic advantage claim is the loss of plaintiff's drivers, who were at-will employees. The only evidence plaintiff has that defendant caused the loss of plaintiff's drivers is that the drivers at issue went to work for defendant at some point after they worked for plaintiff. This is insufficient to establish causation. The fact that the drivers accepted employment with defendant can only show that the drivers found defendant's employment terms acceptable, but the drivers' acceptance of employment with defendant, alone, cannot shed any light on why the drivers chose to end their employment with plaintiff. Why the drivers decided to end their employment with plaintiff is the operative question, and plaintiff has come forward with no evidence that would show that the drivers left because of any action taken by defendant.

Even if plaintiff were able to show that defendant recruited plaintiff's drivers, that recruitment would likely be justified. The record before the Court shows that any recruitment strategies defendant may have employed amounted to promises of a different work environment and perhaps better pay. The *Restatement (Second) of Torts* explains that competing for employees in this fashion is proper:

> *i. Contracts terminable at will.* The rule . . . that competition may be an interference that is not improper also applies to existing contracts that are terminable at will. If the third person is free to terminate his contractual relation with the plaintiff when he chooses, there is still a subsisting contract relation; but any interference with it that induces its termination is primarily an interference with the future relation between the parties, and the plaintiff has no legal assurance of them. As for the future hopes he has no legal right but only an expectancy; and when the contract is terminated by the choice of the third person there is no breach of it. The competitor is therefore free, for his own competitive advantage, to obtain the future benefits for himself by causing the termination. Thus he may offer better contract terms, as by offering an employee of the plaintiff more money to work for him . . ., and he may make use of persuasion or other suitable means, all without liability.

§ 768 cmt. i. The conduct alleged in this case falls squarely within Section 768, and defendant was well within its rights to compete with plaintiff for the future benefit of the drivers' services. The Court, thus, finds that plaintiff cannot establish causation on its tortious interference with prospective economic advantage claim and that defendant is entitled to summary judgment on that claim.

As explained above, the prospective economic advantage claim concerns the recruitment of the drivers themselves and does not address whether defendant caused the drivers to breach their restrictive covenants. Defendant's motion for summary judgment is **granted** as to plaintiff's claim for tortious interference with prospective economic advantage. Plaintiff's claim for tortious interference with contract encompasses only defendant's alleged interference with the restrictive covenants and, thus, survives the grant of summary judgment as to the prospective economic advantage claim.

### C.    *Unjust Enrichment*

The equitable doctrine of unjust enrichment "is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another or receive property or benefits without paying just compensation." *Iowa Dep't of Human Servs. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154 (Iowa 2001) (citations omitted) ("*Palmer*"). "[U]njust enrichment can be distilled into three basic elements of recovery. They are: 1) [the] defendant was enriched by the receipt of a benefit; 2) the enrichment was at the expense of the plaintiff; and 3) it is unjust to allow the defendant to retain the benefit under the circumstances."[16] *Id.* at 154-55 (citations and footnotes omitted).

---

[16] In *Palmer*, the Iowa Supreme Court acknowledged in a footnote that "[t]he court of appeals . . . identified four elements of recovery on the basis of unjust enrichment, including the element that there be no at-law remedy available to the plaintiff. *See Iowa Waste Sys., Inc. v. Buchanan Cty.*, 617 N.W.2d 23, 30 (Iowa Ct. App. 2000)." *Palmer*, 637 N.W.2d at 154 n.2. *See also Union Pac. R.R. Co. v. Cedar Rapids & Iowa City Ry. Co.*, 477 F. Supp. 2d 980, 1000 (N.D. Iowa 2007) (holding that an element of an unjust enrichment claim is that "there is no at-law remedy that can appropriately address the claim" (citations omitted)). The Iowa Supreme

"[U]njust enrichment is a broad principle with few limitations." *Id.* at 155. The benefits a defendant receives can be direct or indirect and need not be conferred directly by the plaintiff. *Id.* (citation omitted). Further, benefits conferred by third parties can be sufficient under an unjust enrichment claim. *Id.* (citation omitted). "The critical inquiry is that the benefit be received at the expense of the plaintiff." *Id.* (citation omitted).

Here, defendant correctly argues that the drivers were enriched by undergoing training at plaintiff's expense then later breaching their restrictive covenants with plaintiff.[17] By doing so, the drivers retained the benefit of the training without the obligation of working exclusively for plaintiff for the duration of the drivers' restrictive terms. When the drivers went to work for defendant, however, defendant indirectly benefitted from plaintiff paying the costs to train the drivers. Those benefits included defendant having the ability to hire trained drivers in the midst of a driver shortage. (*See* Doc. 159-3, at 165 & 171 (defendant's acknowledgment of driver shortage), 201 (defendant's 2017 Form 10-K identifying the driver shortage as an operational risk)).

_____

Court went on to agree that "[t]he adequacy of a legal remedy is a general limitation on the exercise of equity jurisdiction and is properly considered when restitution is sought in equity." *Palmer*, 637 N.W.2d at 154 n.2. The Iowa Supreme Court stopped short of adopting the Court of Appeals' holding, however, in determining that "no independent principle exists that restricts restitution to cases where alternative remedies are inadequate." *Id.* (citation omitted). The parties have not addressed the adequacy of a legal remedy with respect to plaintiff's unjust enrichment claim, and the Court will, thus, decline to address the issue, including the issue of whether the adequacy of a legal remedy is a separate and distinct element of plaintiff's claim.

[17] Under Iowa law, unjust enrichment is "an equitable doctrine based on the concept of an implied contract." *EAD Control Sys., LLC v. Besser Co. USA*, No. C 11-4029-MWB, 2012 WL 2357572, at *3 (N.D. Iowa June 19, 2012) (citation and internal quotation marks omitted). "[A]n express contract and an implied contract cannot coexist with respect to the same subject matter, and the law will not imply a contract where there is an express contract." *Id.* (citations, alterations, and internal quotation marks omitted). The parties have not raised an issue as to whether an express contract is implicated as to plaintiff's unjust enrichment claim, and the Court, therefore, will not address the issue.

When the drivers began working for defendant, the drivers carried with them their pre-existing CDLs, meaning that defendant did not have to invest any funds in training the drivers so that they would be employable. This saved defendant the expense of training these drivers through defendant's own training program, as defendant does with certain unlicensed individuals who are hired as drivers. (*See id.*, at 134-36 (discussing defendant's training program and costs)). This, presumably, increased defendant's profit margin. The difference between defendant's actual profit margin for each driver at issue and the lesser profit margin defendant would have realized had it been required to train the drivers at issue are profits that defendant indirectly obtained as a result of plaintiff paying the training costs. *See Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 544-45 (S.D. Iowa 2007) (recognizing that increased profits can be realized either directly or indirectly and can constitute a benefit under an unjust enrichment claim). Thus, the benefit of additional profits was received at plaintiff's expense.[18]

Having found that the first two elements of plaintiff's unjust enrichment claim are capable of satisfaction, the Court must consider whether plaintiff would be able to show that it would be unjust to permit defendant to retain the benefit. *See Schildberg Rock Prods. Co. v. Brooks*, 140 N.W.2d 132, 138-39 (Iowa 1966). Unjust enrichment can occur, for example, "when a person retains money or benefits which in justice and equity belong to another." *Id.* at 139. Whether it would be unjust to allow a defendant to retain the benefit it received depends on the circumstances implicated. *See Palmer*, 637 N.W.2d at 154-55 (holding that the third element of an unjust enrichment claim is that "it is unjust to allow the defendant to retain the benefit *under the circumstances*" (emphasis added)).

To determine whether, under the circumstances here, principles of justice and equity counsel that the benefits defendant realized belong to plaintiff would require the

---

[18] The measure of defendant's benefit is not necessarily the same as the measure of damages plaintiff may recover. The issue of damages is addressed below.

Court to make findings of genuinely disputed material facts. Specifically, the Court would have to consider the circumstances of this case and would have to make a conclusive finding as to whether it would be just to allow defendant to retain any benefits it may have realized at plaintiff's expense. Defendant argues that it is standard in the trucking industry to hire drivers who have been trained at a competitor's expense. (Doc. 140, at 40). The issue of whether this practice outweighs other considerations that may weigh in favor of plaintiff's position, however, is a question of fact that is in dispute.

Defendant may well be able to persuade the factfinder that it would not be unjust to permit defendant to retain the benefits it realized at plaintiff's expense. Should defendant be able to make this showing, the Court will have to enter judgment in defendant's favor on the unjust enrichment claim. At this stage, however, there exist genuine issues of material fact regarding whether defendant should be permitted to retain the benefits. These factual issues preclude summary judgment.[19] *See Kammueller*, 383 F.3d at 784.

Finally, defendant seeks to limit plaintiff's damages under the unjust enrichment claim and, in support, asserts that "in Iowa, the proper measure of damages for unjust enrichment is limited to the value of the benefit conferred, not a defendant's profits." (*Id.* (citations omitted)). This Court has previously addressed the damages issue. In doing so, the Court acknowledged that the Iowa Court of Appeals "has explained that '[d]amages under a claim of unjust enrichment are limited to the value of what was inequitably retained.'" *Catipovic v. Turley*, 68 F. Supp. 3d 983, 996 (N.D. Iowa 2014)

---

[19] Under Iowa law, "[t]he doctrine of unjust enrichment is an equitable principle." *Johnson v. Dodgen*, 451 N.W.2d 168, 175 (Iowa 1990). Iowa generally does not afford the right to a jury trial on those claims that sound in equity. *Weltzin v. Nail*, 618 N.W.2d 293, 296-97 (Iowa 2000). Here, the parties have demanded a jury trial. (Docs. 43, at 10; 44, at 1). Before trial, the Court may be called upon to address whether to submit plaintiff's unjust enrichment claim to the jury.

(alteration in original) (quoting *Iowa Waste Sys., Inc.*, 617 N.W.2d at 30). The Court went on to explain that "the value of what was inequitably retained" could be "the value of the services provided," depending on the case. *Id.* (citation omitted). Further, the doctrine of unjust enrichment is based, in part, on the principle that a party should not be permitted to receive benefits without paying just compensation. *Palmer*, 637 N.W.2d at 154.

The question, then, becomes what "just compensation" is for the benefits defendant received. If defendant were required to disgorge all additional profits it received by hiring drivers who did not need to be trained, defendant would not be "compensating" plaintiff for training the drivers. Rather, defendant would be disgorging the entire benefit it received. This measure of damages goes beyond what is required by the doctrine of unjust enrichment.

The doctrine permits a party to receive benefits as long as the party pays just compensation. To require defendant to disgorge the entire benefit it received would be tantamount to prohibiting a defendant who was unjustly enriched from retaining any benefits from that unjust enrichment. This is not consistent with the doctrine of unjust enrichment, and the Court will not impose such a prohibition. The Court therefore concludes that the proper measure of damages here is damages that amount to "just compensation," without being in excess of "just compensation." Whether "just compensation" is the costs plaintiff incurred in training the drivers, or whether "just compensation" is measured by some other theory, is for the factfinder to determine. The Court is able to determine, however, that "just compensation" is not disgorgement of defendant's profits. Defendant's motion for summary judgment is **granted in part** to the extent defendant seeks to limit plaintiff's damages, and **denied** to the extent defendant seeks dismissal of plaintiff's unjust enrichment claim.

### D.    *Injunctive Relief*

Plaintiff's prayer for permanent injunctive relief is narrow.  "[Plaintiff] demands the entry of a permanent injunction enjoining [defendant] from any further or continued interference with [plaintiff's] prospective economic advantage and/or contracts with its drivers . . .." (Doc. 43, at 10).  Although plaintiff's request for injunctive relief does not rest, directly, on plaintiff's tortious interference claims, the same facts and legal arguments that form the basis for the tort claims form the basis for plaintiff's request for injunctive relief.

To obtain a permanent injunction, the requesting party must show actual success on the merits of its claim.  *PIC USA v. N.C. Farm P'Ship*, 672 N.W.2d 718, 723 (Iowa 2003) (citation omitted).  Having found that plaintiff's prospective economic advantage claim fails, the Court likewise finds that plaintiff's request for permanent injunctive relief must fail, to the extent plaintiff's request rests on the same basis as the tortious interference with prospective economic advantage claim.  The only issue remaining to be considered under plaintiff's request for injunctive relief is whether injunctive relief could be proper under plaintiff's claim that defendant has interfered, and continues to interfere, with plaintiff's "contracts with its drivers."

Under Iowa law, "[a]n injunction is warranted when necessary to prevent irreparable injury and when the plaintiff has no adequate remedy at law."  *Opat v. Ludeking*, 666 N.W.2d 597, 603 (Iowa 2003) (citations omitted).  A party is entitled to a permanent injunction only if proof exists that the injunction would effectively prevent the irreparable harm from occurring.  *Hockenberg Equip. Co. v. Hockenberg's Equip & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 158 (Iowa 1994) (citation omitted).  "[A] party requesting injunctive relief must establish 1) an invasion or threatened invasion of a right, 2) substantial injury or damages will result unless an injunction is granted, and 3) no adequate legal remedy is available."  *Opat*, 666 N.W.2d at 603-04 (citation and

internal quotation marks omitted). "In deciding whether an injunction should be issued, the court must weigh the relative hardships on the parties by the grant or denial of injunctive relief." *Id.* (citation omitted).

The Court will assume for present purposes that defendant has improperly interfered, and continues to improperly interfere, with plaintiff's Driver Contracts. The harm caused by this interference is the breach of the restrictive terms contained in the Driver Contracts. The loss of trained drivers would fall under plaintiff's request for injunctive relief to prohibit "continued interference with [plaintiff's] prospective economic advantage," which the Court has already found to be an improper basis for injunctive relief. The Court will thus address plaintiff's request for injunctive relief only with respect to the allegation that defendant has caused, and continues to cause, the breach of the restrictive terms contained in the Driver Contracts.

The Court has determined that defendant's act of hiring the drivers satisfies the causation element of plaintiff's contract claim. This, however, does not establish that barring defendant from engaging in this causative action will prevent plaintiff's drivers from breaching their restrictive covenants. The drivers can be in breach of their restrictive covenants by "provid[ing] truck driving services to *any* CRST Competitor within the continental United States of America." (Doc. 130-2, at 51 (emphasis added)). If the Court were to grant the injunctive relief sought, the injunction would not prevent the drivers from breaching their restrictive covenants. Rather, the injunction would only prevent the drivers from breaching their contracts in favor of working for one of many CRST Competitors.[20] Because an injunction against defendant would not prevent the

---

[20] The Court finds that there is no real dispute as to whether plaintiff competes with a number of companies, as opposed to just with defendant. This case is one in a series of four cases filed in this Court against purported CRST Competitors, and each of the cases rests on the same basic allegations and factual assertions. *See TransAm*, 1:16-cv-00052-LTS; *CRST Expedited, Inc. v. Knight Transp., Inc.*, 1:17-cv-00024-CJW-KEM; *CRST Expedited, Inc. v. JB Hunt Transp.,*

drivers from breaching their restrictive covenants and thereby causing plaintiff harm, the Court finds injunctive relief inappropriate. *See Hockenberg Equip. Co.*, 510 N.W.2d at 158 (citation omitted).

Plaintiff has neither alleged nor shown that an injunction would prevent its drivers from breaching their restrictive covenants. Plaintiff argues only that an injunction would prevent defendant from causing plaintiff irreparable harm. (Doc. 159, at 49-53). This argument, however, does not amount to an argument that the irreparable harm will not occur anyway. To truly protect against the irreparable harm alleged, plaintiff would either need to obtain injunctive relief against all of its competitors—or at least a substantial number—or plaintiff would need to obtain injunctive relief against the drivers themselves. Plaintiff is not pursuing either course here.

The Court recognizes that in a proper case, a party could argue that the injunction sought would not, on its own, provide a guarantee against the irreparable harm, but would provide such a guarantee when considered in conjunction with other factors or additional injunctions. That is not this case, however, and the Court thus finds that this theory, if proper, cannot save plaintiff's request for injunctive relief. Defendant's motion for summary judgment is therefore **granted** as to plaintiff's request for injunctive relief.[21]

---

*Inc.*, 1:17-cv-00026-CJW-KEM. Knight and Swift merged in 2017 to form Knight-Swift Transportation Holdings, Inc. Thus, the Court will consider Knight-Swift Transportation Holdings to be one company that competes with plaintiff, rather than two separate entities that both compete with plaintiff. That the number of companies plaintiff competes with was reduced by one, however, is of no consequence to the Court's analysis because there remain three separate competitor companies—TransAm, JB Hunt, and Knight-Swift Transportation Holdings—that the Court can readily identify.

[21] The Court notes that defendant argues this section of its motion for summary judgment with reference to Iowa state law, but plaintiff's arguments in resistance are made largely with reference to federal law. (*Compare* Docs. 140, at 42-45 *with* 159, at 49-58). Regardless of which body of law applies, the Court's conclusions would be the same because the Court finds that the injunctive relief sought would not remedy the harm alleged. *See Winter v. Nat. Res.*

# VI. AFFIRMATIVE DEFENSES

As part of its motion for summary judgment, plaintiff seeks a ruling that eight affirmative defenses fail as a matter of law[22] on the basis that those affirmative defenses assert arguments that would render the Driver Contracts voidable, as opposed to void. (Doc. 130, at 23). The challenged affirmative defenses read as follows:

> First Affirmative Defense: The claims are barred, in whole or in part, because [p]laintiff's Employment Contracts are void, unenforceable, and/or unconscionable.

> Second Affirmative Defense: The claims are barred, in whole or in part, because the Employment Contracts at issue harm and inhibit driver mobility.

> Sixth Affirmative Defense: Plaintiff's claim for permanent injunctive relief is barred, in whole or in part, because such relief constitutes a restraint of trade and violates antitrust laws.

> Twenty-Second Affirmative Defense: The claims are barred, in whole or in part, because the requested relief potentially violates the blacklisting statutes of different states, including but not limited to Iowa Code §§ 730.1 and 730.2 and Arizona Revised Statutes § 23-1361(A).

> Twenty-Third Affirmative Defense: The claims are barred, in whole or in

---

*Def. Council*, 555 U.S. 7, 32 (2008) ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." (citation omitted)); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." (citations omitted)).

[22] In its Motion for Partial Summary Judgment, plaintiff requests that the Court "dismiss[ ]" the subject affirmative defenses. (Doc. 127, at 2). In its brief, however, plaintiff only requests that the Court find that the subject affirmative defenses "fail as a matter of law." (Doc. 130, at 23). Plaintiff has not asserted a procedural basis upon which the Court can strike the affirmative defenses, and plaintiff's arguments regarding the affirmative defenses are offered with reference to summary judgment law. (*See, e.g.*, *id.*, at 5). The Court will, thus, construe plaintiff's motion as seeking a judgment that the subject affirmative defenses fail as a matter of law, and the Court will not consider plaintiff's motion as seeking to strike the affirmative defenses.

part, to the extent [d]efendant's compliance with [p]laintiff's demands and/or requested relief may also be subject to violation of the blacklisting statutes of different states, including but not limited to Iowa Code §§ 730.1 and 730.2 and Arizona Revised Statutes § 23-1361(A).

Twenty-Sixth Affirmative Defense: The claims are barred, in whole or in part, to the extent [p]laintiff breached its Employment Contracts by failing to honor such contracts with its drivers.

Twenty-Seventh Affirmative Defense: The claims are barred, in whole or in part, for lack of a protectable interest supporting the underlying Employment Contracts.

Twenty-Eighth Affirmative Defense: The claims are barred, in whole or in part, for lack of consideration supporting the underlying Employment Contracts.

(Doc. 44, at 13-17).

### A.    *Voidability Defenses*

The Court has already determined that the Driver Contracts are supported by consideration and are valid. Thus, defendant's twenty-eighth affirmative defense, which asserts that the contracts are unsupported by consideration, must fail as a matter of law. Similarly, the Court has already found that the defense that the contracts are not supported by a protectable interest would permit a signatory to avoid the contract, and defendant does not argue that any driver actually did avoid his contract. The twenty-seventh affirmative defense, which relies on defendant's theory that the contracts are not supported by a protectable interest is, consequently, unavailable to defendant and must fail as a matter of law, unless defendant can show that one or more drivers avoided his contract on this basis.

The twenty-sixth affirmative defense purports to defeat plaintiff's claims by asserting that plaintiff breached the contracts. Without reaching the issue of whether plaintiff did breach the contracts, the Court finds that this defense is unavailable to

defendant, unless defendant can show that one or more drivers avoided his contract on this basis. When a party to a contract breaches the contract, the contract becomes *voidable*, not *void*, at the wronged party's option. *JB Hunt*, 2018 WL 2768874, at *13 (citing *Hubbard v. Hartford Fire Ins. Co.*, 33 Iowa 325, 329 (1871)). Defendant has not asserted that any driver attempted to avoid his Driver Contract, and the twenty-sixth affirmative defense therefore must fail as a matter of law if defendant cannot show that a driver attempted to avoid his contract on this basis.

Likewise, the Court has already addressed whether the defense that a contract is "unenforceable" necessarily renders the contract void. The Court answered that question in the negative. Thus, to the extent the first affirmative defense asserts that the Driver Contracts are void, either facially or because they are "unenforceable," the defense must fail as a matter of law. To the extent the "unenforceable" defense asserts a voidability defense, defendant does not have standing to pursue the defense, and the defense therefore must fail as a matter of law, unless defendant can show that one or more drivers attempted to avoid his contract on an "unenforceability" basis. This finding amounts to a finding that the "unenforceable" defense, as articulated in the first affirmative defense, must fail in its entirety as a matter of law on the record currently before the Court.

Finally, the first affirmative defense asserts that the Driver Contracts are unconscionable. As the Court has already determined, this defense would permit a driver-signatory to *avoid* his contract, but the unconscionability would not render the contracts *void*. *See Bartlett Grain Co., LP v. Sheeder*, 829 N.W.2d 18, 26-27 (Iowa 2013) (holding that when a contract is unconscionable, a court *may* refuse to enforce the contract, in whole or in part). Defendant, thus, cannot assert this defense absent actual avoidance, and the defense must fail as a matter of law unless defendant can show that one or more drivers avoided his contract as unconscionable. The first affirmative defense, in its entirety, fails as a matter of law on the record currently before the Court.

Plaintiff's motion for summary judgment is **granted** to the extent plaintiff seeks a determination that the first, twenty-sixth, twenty-seventh, and twenty-eighth affirmative defenses fail as a matter of law on the record currently before the Court.

### B. Remaining Defenses

The defenses that remain to be considered are the second, sixth, twenty-second, and twenty-third affirmative defenses. The twenty-second and twenty-third affirmative defenses both address blacklisting statutes, and the second affirmative defense could be read as implicating blacklisting issues. Plaintiff argues that defendant cannot rely on state blacklisting statutes because the statutes are simply inapplicable here. (*See* Doc. 130, at 17-19). In response, defendant argues that the contracts are void *ab initio* under state blacklisting statutes because the restrictive covenants amount to lifetime bans on commercial driving. (Doc. 146, at 15-16). Defendant's argument rests entirely on the idea that the restrictive covenants amount to lifetime bans, which the Court has already rejected. Thus, to the extent the second, twenty-second, and twenty-third affirmative defenses seek to show the invalidity of the contracts, the defenses fail as a matter of law.

Plaintiff's motion, however, does not address any potential value the second, twenty-second, and twenty-third affirmative defenses could have in defendant's attempts to resist plaintiff's prayer for injunctive relief. To the extent the second, twenty-second, and twenty-third affirmative defenses may be relevant in defending against plaintiff's request for injunctive relief, the defenses survive. The Court notes, however, that even though the second, twenty-second, and twenty-third affirmative defenses do not fail as a matter of law as to plaintiff's prayer for injunctive relief, the Court has found injunctive relief inappropriate. Thus, to the extent the defenses do not fail, they are of no benefit to defendant.

Finally, the sixth affirmative defense directly implicates antitrust law, and the second affirmative defense could be read as implicating antitrust law. Plaintiff argues

that the defenses must fail for two separate reasons. First, plaintiff asserts that the defenses fail because the parties have not entered into an agreement not to recruit each other's drivers. Next, plaintiff argues that defendant "cannot show that its ability to compete in the marketplace is somehow endangered if drivers who received specialized training . . . are required to either pay for that training or drive for [plaintiff]." (Doc. 130, at 8-10). As to the first argument, even if plaintiff is correct that no agreement exists between the parties, the lack of an agreement would not defeat the defense's applicability in assessing whether injunctive relief is proper. If the Court were to grant the injunctive relief plaintiff seeks, which the Court has already determined it will not do, defendant could be prohibited from hiring plaintiff's drivers. Abiding by a negative injunction is different from agreeing to refrain from certain conduct, and plaintiff has not argued that the defense of limited driver mobility would be inapplicable to the Court's equitable consideration of whether to grant injunctive relief.

Similarly, plaintiff has not addressed whether defendant could face antitrust liability for abiding by a negative injunction. In other words, plaintiff has not addressed the competing interests of the antitrust laws and a Court order mandating conduct that would ordinarily be prohibited under the antitrust laws. The Court cannot find, at this stage, that the second affirmative defense, to the extent it implicates antitrust law, and the sixth affirmative defense fail as a matter of law. Again, however, the Court notes that even though these defenses do not fail as a matter of law, the Court has already rejected plaintiff's request for injunctive relief, and these defenses would therefore be of no benefit to defendant, to the extent the defenses would be relevant in arguing against an injunction.

Plaintiff's motion for summary judgment seeking a determination that the second, twenty-second, and twenty-third affirmative defenses fail as a matter of law on the record currently before the Court is **granted** to the extent they seek to show the invalidity of the

Driver Contracts. Plaintiff's motion is **denied** to the extent the second affirmative defense implicates antitrust law. Plaintiff's motion is **denied** as to the sixth affirmative defense. To the extent not otherwise addressed, plaintiff's motion for a determination that certain affirmative defenses fail as a matter of law is **denied**.

## VII.   CONCLUSION

For the aforementioned reasons, plaintiff's Motion for Partial Summary Judgment (Doc. 127) is **granted in part and denied in part**, and defendant's Motion for Summary Judgment (Doc. 138) is **granted in part and denied in part**. Consistent with this Order, plaintiff's claim for tortious interference with contract survives, plaintiff's claim for tortious interference with prospective economic advantage fails as a matter of law, plaintiff's claim for unjust enrichment survives in part, and plaintiff's request for a permanent injunction fails as a matter of law.

**IT IS SO ORDERED** this 4th day of June, 2019.

_____
C.J. Williams
United States District Judge
Northern District of Iowa